UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

LIONEL JUNIOR ERNESTINE                  CIVIL ACTION NO. 6:20-cv-01134

VERSUS                                   JUDGE JUNEAU

COMMISSIONER OF THE SOCIAL               MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, and for the reasons set forth below, it is recommended that the Commissioner's decision should be affirmed.

## Administrative Proceedings

The claimant, Lionel Junior Ernestine, fully exhausted his administrative remedies before initiating this action. He filed an application for disability insurance benefits, alleging disability beginning on May 6, 2013,[1] which was denied.[2] He then requested a hearing, which was held on October 17, 2019 before Administrative Law Judge Carolyn Smilie.[3] The ALJ issued a decision on November 27, 2019,

---

[1] Rec. Doc. 10-1 at 125.

[2] Rec. Doc. 10-1 at 74.

[3] A transcript of the hearing is found in the record at Rec. Doc. 10-1 at 31-73.

concluding that Mr. Ernestine was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date he was last insured.[4]  Mr. Ernestine asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the Commissioner's final decision.[6]  Mr. Ernestine now seeks judicial review of the Commissioner's decision.

## **Summary of Pertinent Facts**

Mr. Ernestine was born on July 15, 1972,[7] and he was 47 years old at the time of the ALJ's decision.  He has a GED, training in culinary arts, and relevant work experience as a floorhand in the oil and gas industry.[8]  He alleged that he became disabled on May 6, 2013[9] due to a back injury, arthritis, and depression.[10]

Mr. Ernestine saw Dr. Philip G. Padgett of W.B.R. Family & Occupational Medicine Clinic on May 10, 2013,[11] complaining of lower back pain after a

---

[4]      Rec. Doc. 10-1 at 14-23.

[5]      Rec. Doc. 10-1 at 5.

[6]      *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]      Rec. Doc. 10-1 at 41, 76.

[8]      Rec. Doc. 10-1 at 41-43, 144, 162.

[9]      Rec. Doc. 10-1 at 143.

[10]     Rec. Doc. 10-1 at 76.

[11]     Rec. Doc. 10-1 at 466-467.

2

workplace incident a few days earlier.  He had normal strength and a normal gait.

Dr. Padgett diagnosed a back strain and released Mr. Ernestine to return to work the

same day and to undertake usual and ordinary activities as tolerated.  Four days

later,[12] Dr. Padgett diagnosed left lumbar back strain, and again released Mr.

Ernestine to return to work and ordinary activities.  Six days after that,[13] Dr. Padgett

prescribed Lortab and advised Mr. Ernestine to continue physical therapy.  He was

again released to return to work and ordinary activities.

On May 30, 2013,[14] Mr. Ernestine began treating with Dr. Steve Wyble, an

interventional pain specialist.  He reported constant back pain rated 10/10.  Neither

six days of physical therapy nor Lortab had helped.  Dr. Wyble noted that Mr.

Ernestine had an antalgic gait, difficulty going from sitting to standing, and difficulty

walking as well as lumbar muscle spasms and lumbar point tenderness.  He had

limited lumbar mobility secondary to pain, a decreased range of motion in the lumbar

region, and pain with flexion, extension, and lateral rotation.  There were muscle

strength deficits in his left leg and sensation deficits in both legs.  With both legs, he

had an abnormal heel and toe walk.  Mr. Ernestine also complained about difficulty

sleeping.  Dr. Wyble diagnosed lumbar back pain, lumbar radiculopathy, and

---

[12]     Rec. Doc. 10-1 at 468.

[13]     Rec. Doc. 10-1 at 469-470.

[14]     Rec. Doc. 10-1 at 342-348.

insomnia.  He prescribed Mobic, Percocet, Zanaflex, and Ambien and opined that Mr. Ernestine could not return to work at that time.

A June 7, 2013 MRI[15] showed mild multilevel lumbar spondylosis with disc desiccation at the L3-S1 disc space levels and a posterior central disc protrusion at L5-S1 that did not indent the thecal sac or impinge a nerve root.

On June 26, 2013, Mr. Ernestine returned to Dr. Wyble.[16]  His symptoms and Dr. Wyble's observations remained the same.  On August 20, 2013, Dr. Wyble administered a lumbar epidural steroid injection at L5-S1.[17]  On August 28, 2013,[18] Mr. Ernestine told Dr. Wyble that the LESI provided short term pain relief.  Because Mr. Ernestine was not improving, Dr. Wyble noted that he would request an EMG and surgical evaluation.  Percocet was continued, but the worker's compensation insurer had denied the other prescriptions.

On October 28, 2013,[19] Mr. Ernestine complained to Dr. Wyble of left sided lower back pain, left hip pain, bilateral hip and foot pain, and intermittent numbness in both legs and great toes.  He rated his pain at 6/10 and reported that it was helped

---

[15]    Rec. Doc. 10-1 at 379.

[16]    Rec. Doc. 10-1 at 337-341.

[17]    Rec. Doc. 10-1 at 333-335.

[18]    Rec. Doc. 10-1 at 327-332.

[19]    Rec. Doc. 10-1 at 320-325.

but not completely relieved by medication. He did not want medication for his reported anxiety and depression. A straight leg raise test was positive on the left. The diagnoses were herniated lumbar disc, radiculopathy, lumbar back pain, chronic pain syndrome, depression with anxiety, and insomnia.

On November 22, 2013, Dr. Wyble administered an EMG/nerve conduction study.[20] The report indicated that Mr. Ernestine had reported low back pain radiating predominantly into the left lateral and posterior portion of the calf and into the foot and occasional symptoms in the right leg and foot. Extended leg raise tests were positive in both legs, more obviously on the left. There was decreased sensation in a left L5-S1 dermatomal pattern and was some weakness of dorsiflexion and plantar flexion on the left as compared to the right. His reflexes were +2 at the knees and +1 at the ankles. His gait was slightly antalgic. The EMG and nerve conduction study showed S1 greater than L5 lumbar radiculopathy characterized by acute denervation superimposed upon early chronic neurogenic units in the S1 distribution and mild early chronic neurogenic units in the L5 distribution.

On December 13, 2013, Mr. Ernestine saw neurosurgeon Dr. Patrick A. Juneau, III.[21] He reported an onset of low back pain and numbness in his legs a couple of days after an industrial incident on May 6, 2013. He reported that physical

---

[20]     Rec. Doc. 10-1 at 382-384.

[21]     Rec. Doc. 10-1 at 365-369.

therapy had worsened his symptoms and that the LESI had provided no relief.  He was taking Percocet for pain.  Upon examination, Mr. Ernestine had tenderness and spasm to palpation over the lumbar paraspinous muscles, tenderness over the left sciatic notch, but no tenderness over the right sciatic notch.  Straight leg raise tests were positive on the left and right.  Dr. Juneau detected no atrophy or fasciculations in the legs.  He had diminished sensation over the posterolateral aspect of the left thigh and calf and into the left foot as well as lesser diminution of sensation in the right leg and diminished ankle reflexes on the left.  Dr. Juneau reviewed the June 3, 2013 MRI and the November 22, 2013 EMG/nerve conduction study.  He proposed a left L4-5 microdiscectomy, left L5-S1 microdiscectomy, bilateral decompressive laminectomy at L4 and L5, and instrumented fusion at L4-5 and L5-S1.

On December 18, 2013, Mr. Ernestine saw Dr. Wyble,[22] rating his pain at 6/10 but also reporting that it had worsened since his last appointment.  Objective findings remained the same.  The Percocet dosage was increased and Trazadone and Zanaflex were prescribed, pending approval by the workers' compensation insurer.

On January 16, 2014, Dr. Juneau revised his surgical recommendation to a left L5-S1 microdiscectomy without a fusion.[23]

---

[22]    Rec. Doc. 10-1 at 313-318.

[23]    Rec. Doc. 10-1 at 363.

Mr. Ernestine saw Dr. Wyble on February 12, 2014.[24]  His complaints were the same and he rated his pain at 5/10.  The objective findings were the same.  Mr. Ernestine reported that the worker's compensation carrier had denied the surgery request.  The prescriptions remained the same.

Mr. Ernestine saw Dr. Juneau on February 20, 2014,[25] continuing to have low back and bilateral leg pain with symptoms worse in the left leg.  On examination, he had classical findings of a left S1 radiculopathy with diminished power in the left S1 myotome, diminished sensation over the left S1 dermatome, and diminished left ankle reflexes.  A left L5-S1 microdiscectomy was planned for February 24, 2014.

Mr. Ernestine returned to Dr. Juneau on March 18, 2014.[26]  He had no more right leg pain and his left leg pain was much improved.  He was to participate in a walking program.  In Dr. Juneau's opinion, Mr. Ernestine was "not fit for duty."

Mr. Ernestine saw Dr. Juneau again on March 28, 2014.[27]  His surgical wound had healed nicely, and he had no right leg pain, weakness, or numbness.  But he did have persistent pain in the left buttock and pain into the left thigh and calf down to the ankle with numbness and tingling sensations extending into the left S1 nerve root

---

[24]    Rec. Doc. 10-1 at 306-311.

[25]    Rec. Doc. 10-1 at 362.

[26]    Rec. Doc. 10-1 at 361.

[27]    Rec. Doc. 10-1 at 359.

distribution.  Dr. Juneau suspected there was inflammation around the left S1 nerve root.  He prescribed Neurontin, a Medrol Dosepak, Motrin, and physical therapy.

Mr. Ernestine saw Dr. Wyble on April 7, 2014,[28] reporting a worsened condition despite the surgery.  He complained of pain in the left low back, buttock, hip, leg, and foot pain and a loss of bowel and bladder function.  He said his right leg was pain free but numb.  He rated his pain at 7/10.  Left leg strength, tone, reflexes, and pulses were normal but sensory deficits were found.  Dr. Wyble prescribed Duragesic, Percocet, and Ambien.

Mr. Ernestine returned to Dr. Wyble on June 4, 2014.[29]  His symptoms were unchanged and he rated his pain at 9/10.  Sensory deficits were noted at L5-S1 on the left and right but his left leg strength, muscle tone, reflexes, range of motion, and pulses were normal.  Dr. Wyble noted that Mr. Ernestine was not at maximum medical improvement.  Duragesic, Percocet, and Ambien, and Soma were continued.  Effexor was started for depression.  Dr. Wyble noted that he would ask the workers' compensation insurer for a mental health evaluation, and he administered a test[30] that signaled anxiety, depression, and suicidal ideation.[31]

---

[28]    Rec. Doc. 10-1 at 298-303.

[29]    Rec. Doc. 10-1 at 291-297.

[30]    Rec. Doc. 10-1 at 395-403.

[31]    Rec. Doc. 10-1 at 296.

Mr. Ernestine saw Dr. Juneau again on June 24, 2014,[32] five months past surgery. X-rays showed alignment of the lumbar vertebral bodies but he was still having residual leg pain although he had improved over his preoperative state. Because of the residual radicular pain, Dr. Juneau opined that Mr. Ernestine would not be able to return to work at a heavy duty capacity, and he estimated that Mr. Ernestine would reach maximum medical improvement from a work standpoint by July 1, 2014. He opined that Mr. Ernestine could return to medium level work, occasionally lifting up to fifty pounds and frequently lifting up to twenty-five pounds with a 5% permanent partial physical impairment rating of the whole body. He was seeing a physical therapist for strengthening and conditioning exercises.

Mr. Ernestine returned to Dr. Wyble on August 4, 2014.[33] Although he continued to complain of back, leg, and foot pain and numbness in both legs, he rated his pain at 3/10. He had been taking Effexor for depression but Dr. Eckholdt had changed him to Cymbalta, which he reported was helping with his depression symptoms. He also reported that his sleep problems improved with Elavil prescribed by Dr. Eckholdt. Dr. Wyble noted that his gait was antalgic on the left. He detected sensory deficits at L5-S1, muscle strength deficits in the left leg, and mild atrophy

---

[32]     Rec. Doc. 10-1 at 358.

[33]     Rec. Doc. 10-1 at 284-290.

of the left thigh and hamstring. He continued the Duragesic, Percocet, and Ambien prescriptions and added Ibuprofen and Soma.

An MRI on August 25, 2014[34] showed mild central canal stenosis at L3-L4 and L4-L5, a central annular tear/fissure at L4-L5, mild right foraminal stenosis at L2-L3, left laminotomy defect at L5-S1 with postoperative fibrosis partially surrounding the thecal sac and left S1 nerve root, and a small paracentral disc protrusion/herniation without central canal or foraminal stenosis.

Mr. Ernestine saw Dr. Juneau on August 26, 2014.[35] In his opinion, the postoperative MRI of August 25, 2014 did not show a recurrent disc herniation at L5-S1, and he did not advocate any further surgery. Examination showed decreased power and sensation in the left leg and diminished left ankle reflexes. A straight leg raise test of the left leg was positive. Mr. Ernestine reported that he could not walk or stand for long without pain in his left leg. Dr. Juneau opined that Mr. Ernestine was at maximum medical improvement and should be restricted to light duty work on a permanent basis due to his residual pain and the amount of scar tissue around the left S1 nerve root depicted on the MRI. Dr. Juneau opined that Mr. Ernestine could occasionally lift no more than twenty pounds and could frequently lift no more

---

[34]    Rec. Doc. 10-1 at 406-408.

[35]    Rec. Doc. 10-1 at 356-357.

than ten pounds.  He assigned a 10% permanent partial physical impairment rating of the whole body.  Dr. Juneau also prescribed physical therapy.

Mr. Ernestine saw Dr. Wyble on October 1, 2014,[36] rating his pain at 9/10. Mr. Ernestine's complaints and Dr. Wyble's observations were unchanged.  The diagnoses were herniated disc, radiculopathy, postlaminectomy syndrome, chronic pain syndrome, depression with anxiety, insomnia, and opioid type drug dependence.  Neurontin was added to his prescribed medications.

Mr. Ernestine returned to Dr. Wyble on December 1, 2014,[37] complaining of pain that he rated 5/10.  Dr. Eckholdt had previously prescribed Cymbalta, Seroquel, and Elavil, but he had stopped taking them and his depression was worsening.  It was noted that his mental health was "fair today."  His medications were continued.

Mr. Ernestine saw Dr. Juneau on January 13, 2015.[38]  X-rays showed that the lumbar vertebral bodies lined up very nicely and there was no abnormal motion in the flexion or extension projections.  Dr. Juneau did not recommend further surgery and opined that Mr. Ernestine was at maximum medical improvement.  In his opinion, the MRI of August 25, 2014 showed swelling of the left S1 nerve root.  He opined that Mr. Ernestine should be limited to sedentary work on a permanent basis,

---

[36]     Rec. Doc. 10-1 at 276-281.

[37]     Rec. Doc. 10-1 at 269-274.

[38]     Rec. Doc. 10-1 at 354-355.

occasionally lifting no more than ten pounds and frequently lifting only lightweight articles.  He assigned a 20% permanent partial physical impairment rating of the whole body; advised Mr. Ernestine to avoid bending, stooping, crawling, and climbing ladders; stated that most of Mr. Ernestine's work should be done in a sitting position; and opined that he should be allowed to stand up and stretch every couple of hours.  He also prescribed physical therapy.

On January 28, 2015, Mr. Ernestine saw Dr. Wyble.[39]  He reported the same symptoms and rated his pain at 7/10.  Dr. Wyble noted that Mr. Ernestine's mental health was "fair today" and that he was "dealing with hopelessness."  He detected decreased sensation in his legs and mild atrophy in his left thigh and hamstring.  The same medications were continued.  Dr. Wyble also noted that he was strongly considering a spinal cord stimulator for neuropathic pain.

Mr. Ernestine again saw Dr. Wyble on March 25, 2015,[40] complaining of pain that he rated 6/10 and numbness in both legs.  He stated that he was able to increase and tolerate activity with a back brace.  Examination showed an antalgic gait on the left, fair mental health, sensory deficits, and mild atrophy in his left thigh and hamstring.  His drug screen was positive for THC but Mr. Ernestine denied using, explaining that his family used in his presence.  Dr. Wyble noted that Mr. Ernestine's

---

[39]     Rec. Doc. 10-1 at 261-266.

[40]     Rec. Doc. 10-1 at 253-259.

pain was not well controlled.  He continued Duragesic, Percocet, Ibuprofen, Soma, and Neurontin.  Dr. Wyble discussed with Mr. Ernestine the possibility of a spinal cord stimulator and indicated that he would request approval of a stimulator trial from the worker's compensation insurer.

Mr. Ernestine saw Dr. Wyble again on May 20, 2015,[41] complaining of pain and weakness.  He rated his pain at 3/10 and reported that his medications helped somewhat.  Dr. Eckholdt had prescribed Xanax and Lamictal.  His gait was antalgic on the left and right.  A new finding was that his reflexes were depressed but symmetrical bilaterally.  All other findings were the same as at the previous visit.

On May 26 and June 16, 2015, Mr. Ernestine was evaluated by Dr. M. Lucile Freeman, a clinical psychologist,[42] upon referral from Dr. Wyble, for evaluation prior to a spinal cord stimulator trial.  He was fully oriented and had an anxious affect and mood.  He gave a history of limited education, incarceration, and work in the oilfield.  He married in 2008 and lived with his wife and young son; his older children lived out of state.  He reported having been treated by Dr. Eckholdt for psychiatric issues since 2014 and planned to continue seeing him every other month. He was taking Gabapentin, Alprazolam, Ibuprofen, Oxycodone, Lamotrigine, and Fentanyl.  Testing showed that Mr. Ernestine was in the borderline to low average

---

[41]    Rec. Doc. 10-1 at 246-251.

[42]    Rec. Doc. 10-1 at 411-419.

range of intellectual functioning.  He acknowledged symptoms of severe depression and a severe level of anxiety.  He also acknowledged suicidal ideation but denied that he would carry it out.  He was focused on pain and health concerns.  Dr. Freeman diagnosed pain disorder associated with both psychological factors and general medical condition, adjustment disorder with mixed anxiety and depressed mood, and borderline intellectual functioning.  She also noted psychosocial stressors including loss of employment, financial concerns, and adjustment to chronic pain.  Her recommendation was that Mr. Ernestine follow Dr. Wyble's recommendations concerning the stimulator trial.

On July 20, 2015, Stephanie P. Chalfin, M.S., reported on her May 1, 2015 vocational evaluation of Mr. Ernestine.  She also summarized numerous medical records she reviewed, including many treatment notes that are not included in the record of this matter.  Mr. Ernestine told Ms. Chalfin that he had chronic pain in his lower back that he described as throbbing and constant.  He said the pain went to his buttocks and radiated to his legs.  He reported right leg numbness and poor sleep secondary to pain.  He reported that the pain inhibited his activities of daily living.  He said he could only stand or walk for short distances and stated that walking, standing, sitting, bending, twisting, lifting, and climbing stairs aggravated his lower back.  He also reported some urinary incontinence after surgery.  He described symptoms of depression, sadness, low self-esteem, hopelessness, and anxiety.  He

was receiving pain management treatment from Dr. Wyble, who prescribed Soma, Percocet, Duragesic Patch, and Neurontin.  Mr. Ernestine was also treating with Dr. Eckholdt, who prescribed Xanax and Lamictal for depressive symptoms.

Mr. Ernestine told Ms. Chalfin that he attended school until the ninth grade then later obtained a GED.  While incarcerated from 1990 to 2007, he completed a culinary arts program.  At the time of his accident, Mr. Ernestine was working for Reliable Production Services as a floorhand, earning $18 per hour.  He had previously worked as a cook, a forklift operator, an asbestos remover, and a grass cutter.  Ms. Chalfin stated that Mr. Ernestine's prior work involved unskilled to semi-skilled occupations with medium to heavy job duties.  She stated that Dr. Juneau precluded Mr. Ernestine from returning to any of his past work.  In Ms. Chalfin's opinion, Mr. Ernestine's vocational outcome for employment was guarded, based on his physical restrictions, chronic pain, lack of acquired skills for sedentary employment, past work history, labor market, background, and psychological problems.

When Mr. Ernestine returned to Dr. Wyble on July 22, 2015,[43] he rated his pain at 9/10 and reported erectile dysfunction.  He indicated that his condition had

---

[43]     Rec. Doc. 10-1 at 238-244.

worsened and he was in more pain. The same findings as at the previous appointment were noted. Viagra was added to his medications.

A dorsal column stimulation trial was begun on August 4, 2015 by Dr. Wyble.[44] A few days later,[45] Mr. Ernestine reported approximately 50-75% pain relief and a 50-75% increase in function and activity during the trial as well as better sleep. He reportedly wanted to proceed with a permanent stimulator.

On August 28, 2015, Dr. Wyble permanently implanted a spinal cord stimulator in Mr. Ernestine's back.[46] The pre- and postoperative diagnoses were chronic pain syndrome, postlaminectomy syndrome lumbar, and lumbar radiculopathy. On August 31, 2015,[47] Mr. Ernestine told Dr. Wyble that his stabbing pain had lessened. On September 16, 2015,[48] he reported that his pain was 5/10. His urinary incontinence had improved, but he was having sexual issues. Dr. Wyble noted that "overall," Mr. Ernestine was doing better with the spinal cord stimulator.

---

[44]    Rec. Doc. 10-1 at 234-236.

[45]    Rec. Doc. 10-1 at 228-233.

[46]    Rec. Doc. 10-1 at 227, 437.

[47]    Rec. Doc. 10-1 at 221-226.

[48]    Rec. Doc. 10-1 at 215-220.

When Mr. Ernestine returned to Dr. Wyble on November 16, 2015,[49] he complained about left buttock, left leg, and left foot pain and numbness and weakness in both legs as well as upper back pain. He rated his pain at 7/10. Dr. Wyble reiterated the same clinical findings as previously noted. Dr. Wyble also noted that the spinal cord stimulator was helping although Mr. Ernestine had had some charging issues. He prescribed Roxicodone, Ibuprofen, Soma, and Neurontin. Mr. Ernestine's drug screen was positive for THC again, and Dr. Wyble discussed this with Mr. Ernestine.

On December 22, 2015, Ms. Chalfin prepared a life care plan for Mr. Ernestine based on the recommendations of Dr. Wyble and Dr. Eckholdt.[50] In her opinion, Mr. Ernestine would be capable of returning to work after stabilization of his mental status and chronic pain.

Mr. Ernestine saw Dr. Wyble again on January 18, 2016.[51] It was noted that the spinal cord stimulator "works ok" but Mr. Ernestine continued to complain of left buttock, leg, and foot pain and weakness in his left leg as well as bilateral upper back and shoulder blade pain into the neck area. Examination of his neck, upper

---

[49]    Rec. Doc. 10-1 at 207-214.

[50]    Rec. Doc. 10-1 at 495-498.

[51]    Rec. Doc. 10-1 at 200-205.

extremities, and thoracic spine showed normal findings, while the findings related to his lumbar spine remained the same.  His medications were continued.

Mr. Ernestine saw Dr. Wyble on March 16, 2016.[52]  He complained of neck, shoulder, upper back, lower back, buttock, leg, and foot pain that he rated 6/10, but he denied depression.  His gait was normal.  Examination of his neck, upper extremities, and thoracic spine was normal.  His lumbar spine findings were unchanged.  It was noted that a functional capacity evaluation of February 2016 indicated that Mr. Ernestine was limited to light duty with restrictions, and Dr. Wyble agreed with that recommendation.

On March 31, 2016, Dr. Wyble noted that the results of a drug screen were again positive for THC, and he discharged Mr. Ernestine from his program.[53]

Mr. Ernestine saw Dr. Juneau on May 12, 2016.[54]  He complained of lower back and left leg pain and reported that the stimulator provided some help, but he still had good days and bad days.  Dr. Juneau again opined that Mr. Ernestine was limited to sedentary work.

---

[52]     Rec. Doc. 10-1 at 193-199.

[53]     Rec. Doc. 10-1 at 192.

[54]     Rec. Doc. 10-1 at 352.

X-rays on May 12, 2016 showed the previous left hemilaminectomy at L5, well preserved alignment, and the dorsal column stimulator.[55]

Mr. Ernestine saw Dr. Juneau on July 14, 2016,[56] complaining of residual left leg pain and numbness.  Dr. Juneau reiterated his opinions that Mr. Ernestine was at maximum medical improvement and was permanently restricted to sedentary work.

When Mr. Ernestine saw Dr. Juneau on March 22, 2018,[57] Dr. Juneau could palpate the lumbar spinal cord stimulator.  He observed that Mr. Ernestine still had diminished sensation in his left leg and diminished left ankle reflexes.  He again opined that Mr. Ernestine was limited to sedentary work.

On June 12, 2018, Mr. Ernestine was examined by Dr. Robert D. Franklin, a physical medicine and rehab specialist.[58]  Mr. Ernestine reported having been in a motor vehicle accident on April 28, 2018 that injured his neck, upper back, left shoulder, mid back, chest, and low back.  He complained of intermittent referred symptoms into both arms to the elbows and both legs to the feet and reported that, before the motor vehicle accident, he had moderate and constant low back pain with referred symptoms into his legs.  He described his current symptoms as severe to

---

[55]     Rec. Doc. 10-1 at 454.

[56]     Rec. Doc. 10-1 at 350.

[57]     Rec. Doc. 10-1 at 472.

[58]     Rec. Doc. 10-1 at 371-372.

unbearable and generally constant.  He said he was sleeping poorly since the accident.  He also reported that he had attended physical therapy without significant relief.  Mr. Ernestine reported that he had an injury on the job in 2013, lumbar surgery in 2014, and a lumbar pain stimulator.  He reported a history of depression and having been in pain management.  Dr. Franklin noted that Mr. Ernestine was a poor historian.  Mr. Ernestine was taking Robaxin and Gabapentin and was reportedly allergic to Meloxicam, Hydrocodone, Penicillin, and Fentanyl.  He had full cervical range of motion but complained of pain with cervical motion and on palpation over the paracervical and trapezius musculature bilaterally.  He complained of pain with motion of the left shoulder and on palpation over the left deltoid and AC joint, over the bilateral scapular and interscapular musculature, and over the left anterolateral chest wall.  He had an abnormal lumbar pelvic rhythm and decreased range of motion on forward flexion.  He guarded on extension.  He complained of pain with forward flexion, extension, and palpation over the bilateral lower lumbar paraspinals and posterior superior iliac spines bilaterally.  Examination showed that he was neurologically intact with regard to motor in the upper and lower extremities but his reflexes were depressed in his upper and lower extremities.  Dr. Franklin stated that Mr. Ernestine might have pain of several etiologies that he would treat conservatively.  His assessments were cervical, thoracic, and lumbar strain; possible underlying spinal pathology; referred symptoms into the bilateral upper and

lower extremities of undetermined etiology; left shoulder pain of undetermined etiology; and chest wall pain.

A CT scan of Mr. Ernestine's left upper arm on July 18, 2018[59] was normal, while a CT scan of his thoracic spine showed mild degenerative changes and the neural stimulator device.  A CT scan of the cervical spine showed small disc protrusions at C3-4 and C4-5, bony hypertrophic changes at C7-T1, and a likely right lobe thyroid nodule.  A CT scan of the lumbar spine showed mild disc bulging at L3-4, disc bulging with dorsal disc protrusion/extrusion at L4-5 with superior migration effacing the ventral thecal sac, and disc bulging with suspicion of a dorsal/left posterior paracentral disc protrusion and spondylitic changes at L5-S1.

Mr. Ernestine saw Dr. Keith R. Mack or nurse practitioner Lauren Bradley at Metropolitan Health Group on August 8, 2018.[60]  His cervical range of motion was limited and painful, with tenderness in the cervical paraspinous muscle on the left, tenderness in the trapezius muscle on the left, and tenderness in the sternocleidomastoid muscles on the left.  He had tenderness in the anterior bilateral chest wall/rib pain reportedly from his seat belt at impact.  There was tenderness at the midline of his thoracic spine and in the muscles bilaterally as well as spasm bilaterally.  His range of motion was normal and painful in his lumbar spine, with

---

[59]     Rec. Doc. 10-1 at 373-376.

[60]     Rec. Doc. 10-1 at 483-486.

tenderness at the midline and in the muscle bilaterally with spasm present bilaterally. Straight leg raise tests were positive in both legs. Range of motion was limited and painful in his left shoulder, which was also tender. He was referred to a primary care physician and to an orthopedist; he was to be evaluated for physical therapy; and Flexeril and Indomethacin were prescribed.

Mr. Ernestine saw Dr. David Wyatt at Orthopaedic Care Center of Louisiana on August 30, 2018.[61] He reported an increase in back pain since the motor vehicle accident as well as neck pain that radiated to his shoulders and radicular pain from his back to his left hip and down the left leg. He reported having been discharged from physical therapy and having been out of pain management for two years. He also reported that his neurostimulator had stopped working. He denied lack of bladder control, depression, mood swings, or nervousness. His station and gait were normal. In the cervical spine, he had pain with flexion and extension as well as side-to-side bending and pain radiating bilaterally to his trapezius muscles. In the thoracic region, he was tender to the midline as well as the paraspinous musculature. In the lumbar area, flexion, extension, and side-to-side movement were painful with tenderness in the midline as well as to the paraspinous musculature. He had a positive straight leg raise test with pain radiating to the left hip and down the left leg.

---

[61]    Rec. Doc. 10-1 at 457-460.

Dr. Wyatt's assessments were musculoligamentous strains, cervical, thoracic, and lumbar; protrusions at C3-4 and C4-5; and disc bulges at L3-4, L4-5, and L5-S1 without annular tears. He prescribed Norco and Norflex. Mr. Ernestine's allergy to steroids precluded an LESI. In Dr. Wyatt's opinion, Mr. Ernestine would not benefit from surgical intervention, and he recommended a pain management referral.

On September 27, 2018, Mr. Ernestine returned to Dr. Wyatt,[62] complaining of neck pain rated 8/10, back pain rated 9/10, and radicular pain down his legs rated 9/10 as well as numbness and tingling down his arms and legs. He reported that his medication helped sometimes, and he denied any new accidents. His physical examination was essentially unchanged. He was given a Norco prescription and referred to pain management.

Mr. Ernestine saw Dr. Wyatt again on November 8, 2018.[63] His complaints were the same. Dr. Wyatt noted that Mr. Ernestine did not want surgeries or injections since he had them in the past. He was going to refer him to pain management.

On April 10, 2019, Dr. Wyble confirmed that Mr. Ernestine's stimulator was no longer functioning.[64]

---

[62]    Rec. Doc. 10-1 at 461-462.

[63]    Rec. Doc. 10-1 at 463.

[64]    Rec. Doc. 10-1 at 474.

On October 17, 2019, Mr. Ernestine testified at a hearing. He stated that his back condition worsened after having surgery performed by Dr. Juneau and that Dr. Juneau limited him to sedentary work. He stated that he hurt all the time. He testified that he took pain medication from the date of the accident until a spinal cord stimulator was implanted in his back in 2015. He testified the the spinal cord stimulator was implanted in his back by Dr. Wyble in 2015 but he had problems with it working inconsistently and causing shocks and burns before it stopped working altogether. He complained about shooting pains in his legs and his legs giving out causing him to fall. He estimated that he can stand for about seven to eights minutes before having to sit down to relieve pressure in his back. He stated that, before the stimulator was implanted, he had daily back pain that he rated at nine or ten. Mr. Ernestine stated that he saw Dr. Scott Eckholdt, a psychiatrist, from 2014 to 2016 and took a variety of medications for depression and anxiety, which was helpful.

Mr. Ernestine now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence.[65] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[66] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[67]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[68]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[69]  Conflicts in the evidence[70] and credibility assessments[71] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the court in determining whether substantial evidence supports the Commissioner's determination:  (1) objective

---

[65]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[66]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[67]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[68]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[69]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[70]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[71]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

25

medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[72]

## B.    <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[73]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[74]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant

---

[72]    *Wren v. Sullivan*, 925 F.2d at 126.

[73]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1765, 1772 (2019).

[74]    42 U.S.C. § 1382c(a)(3)(A).

26

lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[75]

## C.    **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[76]

Before going from step three to step four, the claimant's residual functional capacity[77] is evaluated, by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[78]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[79]

---

[75]    42 U.S.C. § 1382c(a)(3)(B).

[76]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[77]    20 C.F.R. § 404.1520(a)(4).

[78]    20 C.F.R. § 404.1545(a)(1).

[79]    20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[80]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[81]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[82]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[83]

## D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since December 31, 2015.  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Mr. Ernestine has four severe impairments: degenerative disc disease, residual effects of lumbar surgery, adjustment disorder

---

[80]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[81]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[82]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[83]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

with mixed anxiety and depressed mood, and borderline intellectual functioning. This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Mr. Ernestine has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  Mr. Ernestine did not challenge this finding.

The ALJ found that Mr. Ernestine has the residual functional capacity to perform sedentary work except for the following: he can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; he can occasionally balance and stoop; he should not be exposed to work at unprotected heights or moving mechanical parts; and he should perform unskilled work where he can alternate sitting and standing for one to minutes every thirty minutes without being away from the workstation.  The claimant challenged this finding.

At step four, the ALJ found that Mr. Ernestine claimant is not capable of performing any  past relevant work.  The claimant did not challenge this finding.

At step five, the ALJ found that Mr. Ernestine was not disabled from the alleged disability onset date through the date last insured because there are jobs in the national economy that he can perform.  The claimant challenged this finding.

### E.    The Allegations of Error

Mr. Ernestine contends that the ALJ erred (1) in denying benefits because his condition is not "severe enough;" (2) in relying on evidence postdating December

2015; (3) in giving more weight to Dr. Padgett's opinions than to Dr. Wyble's opinions; (4) in analyzing Stephanie Chalfin's opinions; (5) in failing to obtain Dr. Eckholdt's records; and (5) in relying on the opinions of the vocational expert.

## G.   Did the ALJ Err in Denying Benefits Because the Claimant's Condition is not "Severe Enough"?

The ALJ found that Mr. Ernestine has four severe conditions but she further found that his impairments "are not severe enough to meet or medically equal, either singly or in combination, one of the [listed] impairments."[84]  Mr. Ernestine contends that this was error on the ALJ's part.  But Mr. Ernestine did not identify a listed impairment that he contends is relevant nor did he attempt to show how his symptoms meet the criteria for any listed impairment.  According, the ALJ did not err in referring to his impairments as failing to meet or medically equal a listed impairment.

## H.   Did the ALJ Err in Relying on Evidence Postdating December 2015?

Mr. Ernestine was insured for DIB benefits only through December 31, 2015. Therefore, to qualify for DIB benefits, he must have become disabled on or before that date.  Mr. Ernestine argued that the ALJ erred in relying on Dr. Wyble's opinion dated March 31, 2016 that Mr. Ernestine could perform light duty work because that opinion postdated his date last insured.

---

[84]     Rec. Doc. 10-1 at 17.

But the ALJ did not find that Mr. Ernestine could perform light duty work. To the contrary, the ALJ found that he had the residual functional capacity to perform only sedentary work and then with certain restrictions.  A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[85]  The ALJ is responsible for determining a claimant's residual functional capacity.[86]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[87]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[88]  In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ must consider the

---

[85]     *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[86]     *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[87]     *Martinez v. Chater*, 64 F.3d at 176.

[88]     *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[89]

Here, the ALJ reviewed the medical evidence but obviously placed greater credence in Dr. Juneau's repeated opinion that Mr. Ernestine was capable of performing sedentary work and adopted that opinion in crafting her residual functional capacity finding. Because of Dr. Juneau's opinion – which was repeated on four occasions between January 2015 and March 2018 – both before and after the date on which Mr. Ernestine was last insured – there is substantial evidence in the record supporting the ALJ's finding that Mr. Ernestine can do sedentary work.

Thus, while the ALJ mentioned Dr. Wyble's light duty opinion in reviewing the record, the ALJ did not adopt that opinion in her residual functional capacity finding. Therefore, the ALJ's reference to Dr. Wyble's opinion was not erroneous.

## I.    Did the ALJ Err in Weighing the Medical Opinions?

Mr. Ernestine argued that the ALJ erred in finding Dr. Padgett's opinions to be more persuasive than Dr. Wyble's opinions. The ALJ has a duty to weigh medical opinions.[90] In doing so, the ALJ should consider the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability,

---

[89]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

[90]    20 C.F.R. § 404.1520c.

consistency, specialization, and any other factor which the claimant brings to the court's attention,[91] but should focus primarily on the supportability and consistency of the opinions.[92]

As Mr. Ernestine noted in his briefing, the ALJ expressly weighed Dr. Padgett's opinion from May 2013 that the plaintiff was able to return to work at that time, and she expressly weight Dr. Wyble's opinion based on a functional capacity evaluation of February 2016 that he could perform light duty work with restrictions. The ALJ found Dr. Padgett's opinion to be "persuasive and consistent with the evidence" and found Dr. Wyble's opinion to be "somewhat persuasive." But neither of those opinions were adopted by the ALJ in determining Mr. Ernestine's residual functional capacity. The ALJ neither agreed with Dr. Padgett that Mr. Ernestine could return to his prior work, nor with Dr. Wyble that he could perform light duty work. Instead, the ALJ relied more heavily upon the opinion of Dr. Juneau, which the ALJ found "persuasive and consistent with the evidence," that Mr. Ernestine could perform only sedentary work and then with certain restrictions. Regardless of how much weight the ALJ gave to Dr. Padgett's opinion or Dr. Wyble's opinion, neither of those opinions was adopted. Accordingly, the weight assigned to those opinions did not control the ALJ's residual functional capacity finding.

---

[91]    20 C.F.R. § 404.1520c(c)(1-5).

[92]    20 C.F.R. § 404.1520c(b)(2).

Furthermore, even if the ALJ erred in weighing Dr. Padgett's and Dr. Wyble's opinions, it was a harmless error.    An ALJ's error is harmless when it is inconceivable that a different administration conclusion would have been reached absent the error.[93]  Had the ALJ relied on either Dr. Padgett's opinion or Dr. Wyble's opinion, she still would have found that Mr. Ernestine was not disabled.  Therefore, any error in weighing those two opinions was harmless.

**J.    Did the ALJ Err in Analyzing Ms. Chalfin's Opinions?**

Mr. Ernestine argued that the ALJ erred in failing to give adequate weight to the opinions of Stephanie Chalfin, M.S., a vocational rehabilitation consultant, and mischaracterized her opinions as consistent with those of Dr. Juneau.  While it is correct that the ALJ is required to evaluate the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record, Ms. Chalfin is not a medical source and cannot give a medical opinion.[94]  Therefore, her opinions are not to be weighed in the same way that medical opinions are to be weighed by the ALJ.  Still, Ms. Chalfin did opine that once Mr. Ernestine's mental status and chronic pain were stabilized, he would be capable of employment.[95]  That statement is not inconsistent

---

[93]    See *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

[94]    20 C.F.R. § 404.1502(d); § 404.1513(a)(2).

[95]    Rec. Doc. 10-1 at 497.

with Dr. Juneau's opinion that Mr. Ernestine could do sedentary work.  Accordingly, any failure of the ALJ to give more weight to Ms. Chalfin's opinion would not have changed the result and, consequently, is harmless.

## K.    Did the ALJ Err in Failing to Obtain Dr. Eckholdt's Records?

Mr. Ernestine argued that the ALJ erred in failing to obtain records from his treating psychiatrist, Dr. Scott Eckholdt.  The regulations require the agency to make a reasonable effort to obtain the claimant's medical records, which is defined as including an initial request and one follow up request.[96]  In this case, Dr. Eckholdt's records were requested twice.[97]  Apparently, the agency received no response to those requests.  At the hearing, Mr. Ernestine's attorney seemed surprised that Dr. Eckholdt's records had not been obtained and made a part of the record.  However, it does not appear that Mr. Ernestine's counsel reviewed the record sufficiently in advance of the hearing to assure that all requested records had been obtained nor did she obtain the records herself and submit them for inclusion in the record.  While the "ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts,"[98] the ALJ's duty to

---

[96]    20 C.F.R. 404.1512(b)(1)(i).

[97]    Rec. Doc. 10-1 at 74.

[98]    *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)).

develop the record must be balanced against the fact that claimants bear the burden of proof with regard to the first four steps of the disability analysis.[99]  Under the facts of this case, the ALJ cannot be faulted for Mr. Ernestine's failure to make sure that Dr. Eckholdt's records were included in the record.  The claimant failed to satisfy his burden of proof.

## L.    **Did the ALJ Err in Relying on the Vocational Expert's Opinions?**

Mr. Ernestine contends that the ALJ erred in relying on the vocational expert's opinion expressed at the hearing, arguing that the expert gave no opinions about whether the claimant could have worked from May 6, 2013 through December 31, 2015.  But a vocational expert is not qualified to offer a medical opinion on a claimant's ability to work.[100]  The role of the vocational expert is simply to advise whether jobs exist in the national economy that could be performed by the hypothetical person described by the ALJ, not to opine as to the employability or disability of the actual claimant.  Therefore, the ALJ did not err in relying on the opinions given by the vocational expert in this case.

---

[99]     *Holifield v. Astrue*, 402 Fed. App'x 24, 26 (5th Cir. 2010) (citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)).

[100]    See *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989).

## Conclusion and Recommendation

The claimant did not establish that the ALJ used improper legal standards were in evaluating the evidence or that the ALJ's decision was not supported by substantial evidence. Accordingly, for the reasons fully discussed above, this Court recommends that the Commissioner's decision should be AFFIRMED and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[101]

---

[101]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).

Signed in Lafayette, Louisiana, this 12th day of January 2022.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE